**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

|  |  |
|---|---|
| **CHARTWELL PROPERTIES, LLC**<br><br>                         **PLAINTIFF,**<br><br>       **v.**<br><br>**ROBERT C. LOW; NEW PRIME, INC.;**<br>**WOLVERINE LAND HOLDINGS, LLC;**<br>**BILL KILLIAN; TONY SMITH; DAMIAN**<br>**PROBSTFIELD;  DEAN HOEDL; AND**<br>**HEATH LAMMEY.**<br><br>                         **DEFENDANTS.** | **Civil No. _____**<br><br>**JURY DEMAND** |

**COMPLAINT**

# TABLE OF CONTENTS

I.     **PRELIMINARY STATEMENT** ........................................................... 1

II.    **PARTIES AND NONPARTIES** ..................................................... 6

III.   **JURISDICTION AND VENUE** ..................................................... 7

     A.   Wolverine entered into multiple financing arrangements with Chartwell, a Tennessee company, secured by real property in Nashville, and communicated extensively with Chartwell representatives in Tennessee regarding these transactions. ................................ 8

     B.   New Prime funded Wolverine's loans to Chartwell, with knowledge that the loans concerned a Tennessee project and a Tennessee borrower, and its officers negotiated financing terms with Chartwell representatives in Tennessee. ........................................... 8

     C.   Robert Low, Dean Hoedl, and Damian Probstfield negotiated and administered the Wolverine financing through meetings, phone calls, and emails with Chartwell representatives in Tennessee, and Low made the ultimate decision to extend financing after meeting with Chartwell representatives who traveled from Tennessee. ........................... 8

     D.   Bill Killian, Tony Smith, and Heath Lammey directed Killian's work on The Manning, visited the Nashville site, and communicated with Chartwell in Tennessee regarding construction progress, schedules, and invoices. .................................................................................... 8

IV.   **FACTS** ............................................................................................... 9

     A.   Chartwell decided to build The Manning, obtained initial construction financing, and hired Killian as its general contractor. ............................................................. 9

     B.   After Killian began construction, The Manning fell behind schedule. .............................. 11

     C.   Defendants implemented their scheme by further delays that caused Chartwell to exhaust its funding, forcing Chartwell to turn to Defendants for a loan. ........................................ 14

     D.   Chartwell traveled to Springfield, Missouri to finalize a financing arrangement with Wolverine, and Defendants continued to execute their scheme. ........................................ 17

     E.   Defendants further escalated their scheme by continuing to delay completion of the project after providing financing to Chartwell. .............................................................. 22

     F.   Defendants continued their mismanagement, delay, and overcharging, and Chartwell was forced to increase its line of credit from Wolverine. ........................................................ 23

     G.   Killian abandoned the project, and Chartwell is forced to incur more debt and hire another general contractor to finish the job. ................................................................. 24

     H.   Project superintendent Clinton Jones disclosed to Chartwell that defendants would not allow him to finish the project. ............................................................................. 26

     I.   Because Killian had failed to finish the project and Chartwell needed additional funds to do so, Chartwell had to borrow even more money from Wolverine. ................................ 27

     J.   Defendants' fraudulent scheme has caused Chartwell to incur and suffer tens of millions of dollars of damages. ................................................................................. 28

i

 K. Wolverine's foreclosure of The Manning would cause irreparable harm to Chartwell for which no adequate remedy exists at law. ........................................................................... 29

V.  CAUSES OF ACTION ............................................................................................ 31

COUNT I: RICO ENTERPRISE (18 U.S.C. § 1962(C)) ......................................... 31

COUNT II: FRAUD, PROMISSORY FRAUD, FRAUDULENT CONCEALMENT, AND FRAUDULENT INDUCEMENT ................................................................................. 34

COUNT III: CIVIL CONSPIRACY ....................................................................... 37

COUNT IV: PIERCING CORPORATE VEIL ........................................................ 40

COUNT V: NEGLIGENT MISREPRESENTATION .............................................. 41

COUNT VI: ECONOMIC DURESS ......................................................................... 42

COUNT VII: UNJUST ENRICHMENT .................................................................. 43

COUNT VIII: DECLARATORY JUDGMENT VIOLATION OF TENN. CODE ANN. § 47-14-117 ............................................................................................................ 44

COUNT IX: INJUNCTIVE RELIEF ........................................................................ 46

PRAYER FOR RELIEF ................................................................................................ 47

# I. PRELIMINARY STATEMENT

1.      This is a case about an elaborate and fraudulent scheme perpetrated by one of America's richest men. Defendant Robert C. Low, the billionaire owner of a successful Missouri trucking company known as New Prime, Inc., owns and directs three closely related companies—New Prime, Inc., Wolverine Land Holdings, LLC, and KCC Contractor, Inc. ("Killian")—that purport to work legitimately and collectively to finance and construct real estate projects, including condominiums and hotels. But in truth, Low's closely held companies and his associates operate a racketeering scheme. Defendants use these businesses as tools in an elaborate scheme to defraud innocent developers and investors—and in the process, to line their own pockets.

2.      More specifically, Defendants deploy Killian, a commercial general construction firm, to draw in innocent developers and owners. Once a developer retains Killian as general contractor, Killian springs the trap: it purposefully provides false completion schedules and construction costs. Thereafter, Killian mismanages the construction process, purposefully slows the project, and submits fraudulent invoices and change orders seeking millions in unwarranted payments. This deliberate construction mismanagement results in delays and persists, despite Killian's repeated verbal and written assurances of timely completion, until the developer's equity contributions and existing loan are depleted.   At that point, Killian introduces the now cash-strapped developer to Wolverine, a closely affiliated development finance company owned by Robert Low, and explains that Wolverine, using funds supplied by New Prime, Inc., can provide short-term financing so Killian can "quickly" finish the job.

3.      Defendants then tighten the vise by using Wolverine—a company that is funded by and "part of" New Prime, Inc.—to approach the developer, who by this point has no alternative financing options, with an offer of short-term financing at an exorbitant rate. The funding comes only if the developer first pays Killian's outstanding, fraudulent invoices and change orders,

swallows Killian's falsehoods about the project's completion date, and uses Killian to finish the job. Faced with coercive leverage from Defendants, the developer is left with no real choice but to accept their offer of financing and accede to their demands. Through this unlawful scheme, Defendants ensure that Killian is paid for unverified fraudulent change orders and defective work. Wolverine—and, by extension, New Prime, Inc. and the individual Defendants—simultaneously extracts millions in interest and origination fees it would not have otherwise obtained.

4. This conduct, standing alone, constitutes a brazen fraud. But the scheme does not end there. Instead of completing the project before the short-term loan matures—as Defendants repeatedly promised to do, verbally and in writing—Killian continues to mismanage and delay the construction process, which allows Defendants to rerun the scheme: the developer is pressured to pay Killian's fraudulent change orders and invoices and to accept additional, costly funds from Wolverine, clinging to the fading hope that Killian will finally complete the project as promised. This cycle continues until the developer's funds are exhausted and Wolverine can accelerate the debt, increase the interest rate, and foreclose—by which point the developer and condominium buyers have been repeatedly victimized by Defendants' fraudulent conduct and greed.

5. Plaintiff Chartwell Properties, LLC fell victim to precisely this scheme. Chartwell is a Nashville-based developer that retained Killian to construct The Manning, a 36-unit ultra-luxury condominium project near Belle Meade in Nashville. Units in the development range from 2,650 square feet to 6,000 square feet for penthouses and were priced from $2.5 million to $6 million. Beginning in 2018, the Chartwell team, which has over 300 collective years of development experience, approached The Manning prudently, with an equity investment of some $35 million dollars and a $55.8 million construction loan from Simmons Bank. The construction schedule targeted milestone unit deliveries that would correspond with the maturing construction

2

bank debt. Chartwell and multiple buyers of condominium units in The Manning relied on Killian's verbal and written commitments for the construction schedule and project completion.

6. Killian repeatedly failed to hit its promised deadlines. Killian initially promised to substantially complete the project by November 2021. That failed. Then it promised to be done by January 2023, in order to enable a well-known individual to move in. That failed. Then, Killian promised to be done by mid-April 2023. Killian knew that Chartwell needed Killian to complete the project on the original timeline, or at least shortly thereafter, to use unit-sale proceeds to service its maturing construction loan with Simmons Bank. That loan came due in June 2023. Yet Killian missed its revised deadline again. Between January and June 2023, two Chartwell owners were forced to loan Chartwell approximately $14 million so construction could continue. But Killian yet again misrepresented the project's timeline, delayed further, and steered Chartwell to speak with Low, New Prime, and Wolverine about "helping" its funding situation.

7. Defendants then moved in for the kill, initiating discussions with Wolverine to extend Chartwell a short-term loan at an excessive interest rate and with exorbitant origination fees so that Killian could purportedly complete the project. In return for Wolverine's financing package, Chartwell agreed to pay all outstanding Killian invoices—including undocumented and false "change orders." Defendants induced Chartwell to accept this offer through at least two material misrepresentations: that Wolverine's $93 million loan would pay off the outstanding Simmons Bank construction loan and fully fund all remaining construction and development costs of the project, and that Killian could and would finish the construction on time and before the loan matured. Confronted with Killian's repeated delays and a maturing bank loan, Chartwell had no realistic option to locate another source of funding or another contractor to complete the project.

8. Defendants then escalated the scheme. Not long after Chartwell agreed to

Defendants' demands and accepted Wolverine's $93 loan, Killian inexplicably shut down The Manning's construction. Killian's action caused subcontractors to walk off the job and was calculated to ensure that the project could not be completed before Wolverine's loan matured.

9. Killian continued to deliberately mismanage the construction project and slow the schedule—while repeatedly misrepresenting the completion timeline—to ensure the work would not be finished before Wolverine's loan matured in May 2024. Compounding the harm, and unbelievably to the Chartwell team, in early November 2023 Killian presented Chartwell with more than $3.7 million in "change orders" predating the September 29 loan closing. Eventually, Killian had submitted change orders predating the loan closing totaling over $11 million. These demands contradicted Defendants' repeated assurances that Wolverine's $93 million loan would suffice to complete the project. Defendants knowingly concealed these change orders and purported cost overruns from Chartwell as part of their fraudulent scheme.

10. This fraudulent scheme forced Chartwell to be responsible for tens of millions of dollars in additional costs—including inflated and improper payments to Killian, accumulating interest and fees to Wolverine, and increased carrying costs. As designed, Chartwell had no real option but to seek further financing from Wolverine, enabling Defendants to extract still more of Chartwell's funds well after Killian abandoned the project in April 2024. In total, and at the peak of the indebtedness, Chartwell received more than $130,000,000 in loans from Wolverine.

11. Chartwell eventually learned that other developers and owners have fallen victim to the same scheme. They, too, reasonably relied—and other developers may continue to rely—on the very misrepresentations and falsehoods that deceived Chartwell. In 2022, a Florida developer sued many of the same defendants in Florida state court, alleging that those defendants used Killian to delay completion of a condominium project so New Prime and Wolverine could keep collecting

interest on its high-rate loan; the case resolved by confidential settlement. More recently, the owner and developer of a Florida hotel alleged in federal court in Panama City, Florida that Killian submitted false invoices and unreasonably delayed construction of an Embassy Suites to draw down as much of the construction loan as possible before walking away. This case was also resolved by confidential settlement. The course of conduct alleged in those suits underscores what the facts here already show. By perpetuating this scheme and repeatedly defrauding Chartwell, Defendants are engaging in an ongoing pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

12.     Due to Defendants' fraudulent conspiracy and racketeering scheme, Chartwell has been induced to pay more than $35 million in interest and fees to Wolverine and approximately $10 million to Killian for work that was defective or never performed. The scheme's delay also forced Chartwell to pay increased carrying costs of more than $5 million. Chartwell is entitled to a judgment of at least $50 million in compensatory damages, which must be trebled as a matter of law, plus consequential and punitive damages, together with attorney's fees and costs. The total damages sought against Defendants, jointly and severally, are in excess of $200 million.

13.     Chartwell remains subject to the end-stage of Defendants' fraudulent scheme, in which it is paying exorbitant default-rate interest and fees while facing the reality of imminent foreclosure of The Manning by Wolverine pursuant to its deed of trust. Foreclosure of The Manning—which was, quite likely, one of Defendants' primary goals from the beginning—would deprive Chartwell of its title to, and interest in, this uniquely situated, luxury condominium development; would permanently damage its reputation, brand, and goodwill in the community; and would cut off any hope Chartwell has of enforcing a judgment in its favor against Defendants, thereby causing non-quantifiable harms that no monetary award can repair.

5

## II. PARTIES AND NONPARTIES

14.     Plaintiff Chartwell Properties, LLC ("Chartwell") is a commercial developer focused on building luxury residences in Nashville. Chartwell is a limited liability company, organized under Tennessee law, with its principal place of business in Nashville, Tennessee. Chartwell's members reside in the State of Tennessee and the State of Texas.

15.     Defendant Wolverine Land Holdings, LLC ("Wolverine") is a Missouri limited liability company with its principal place of business in Springfield, Missouri. Its registered agent is Steve Crawford at 2740 North Mayfair, Springfield, Missouri 65803. Wolverine's controlling member is Robert C. Low, who is domiciled in the State of Missouri. Upon information and belief, Wolverine's two members (Low and his wife, Lawana Low) reside in the State of Missouri.

16.     Defendant New Prime, Inc. ("New Prime") is a Nebraska corporation with its principal place of business in Springfield, Missouri. Its registered agent is Steve Crawford at 2740 North Mayfair, Springfield, Missouri 65803.

17.     Non-Party Killian Contractor, Inc. is a Missouri corporation with its principal place of business in Springfield, Missouri. Its principal office address is 2664 East Kearney Street, Springfield, Missouri 65803. Its registered agent is CT Corporation System, 5661 Telegraph Road, Suite 4B, Saint Louis, Missouri 63129. Killian Contractor, Inc. is not a party to this lawsuit but is a member of the unlawful conspiracy and racketeering enterprise alleged herein.

18.     Nonparty KCC Contractor, Inc. is a Missouri corporation with its principal place of business in Springfield, Missouri. Its principal office address is 2664 East Kearney Street, Springfield, Missouri 65803. Its registered agent is CT Corporation System, 5661 Telegraph Road, Suite 4B, Saint Louis, Missouri 63129. KCC Contractor, Inc. is not a party to this lawsuit but is a member of the unlawful conspiracy and racketeering enterprise alleged herein.

19.     Non-parties Killian Contractor, Inc. and KCC Contractor, Inc., sometimes referred

6

to as Killian Construction Company, are collectively referred to herein as "Killian."

20. Defendant Robert C. Low is an individual who resides in Springfield, Missouri. Based on information and belief, Low is the Chief Executive Officer and Majority Shareholder of New Prime, Inc. Low is also the majority shareholder and former CEO of Killian and a 50 percent shareholder of Wolverine.

21. Defendant Dean Hoedl is an individual who resides in Springfield, Missouri. Based on information and belief, Hoedl is the Chief Financial Officer of New Prime, and he is a manager and the Chief Financial Officer of Wolverine.

22. Defendant Damian Probstfield is an individual who resides in Springfield, Missouri. Probstfield is a senior financial analyst at New Prime and a manager at Wolverine. Probstfield has served as Killian's Chief Financial Officer since January 2022.

23. Defendant William ("Bill") Killian[1] is an individual who resides in Springfield, Missouri. Bill Killian is a shareholder of Killian and Killian's Head of Business Development. He formerly served as Killian's Chief Executive Officer.

24. Defendant Tony Smith is an individual who resides in Springfield, Missouri. Smith has worked as Killian's Chief Executive Officer since January 2022.

25. Defendant Heath Lammey is an individual who resides in Springfield, Missouri. Lammey works as a Project Executive for Killian.

26. An organizational chart showing the various relationships among the Defendants, upon information and belief, is enclosed as **Appendix 1** to this Complaint.

### III. JURISDICTION AND VENUE

27. This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331

---

[1] This Complaint refers to Defendant Bill Killian as "Bill Killian" and the non-party entities Killian Contractor, Inc., KCC Contractor, Inc., and Killian Construction Company collectively as "Killian."

7

because this lawsuit arises under the federal racketeering statute, 18 U.S.C. § 1964(c). This Court also has supplemental jurisdiction under 28 U.S.C. § 1367.

28.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because it is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs. In particular, upon information and belief, each Defendant (including the business entities) is domiciled in Missouri or Nebraska, and none of Chartwell's members are domiciled in those states.

29.     This Court has personal jurisdiction over all Defendants. Each Defendant purposefully availed itself or himself of the privilege of conducting activities in Tennessee and directing conduct toward Tennessee residents, and this action arises from those contacts:

        A.     Wolverine entered into multiple financing arrangements with Chartwell, a Tennessee company, secured by real property in Nashville, and communicated extensively with Chartwell representatives in Tennessee regarding these transactions.

        B.     New Prime funded Wolverine's loans to Chartwell, with knowledge that the loans concerned a Tennessee project and a Tennessee borrower, and its officers negotiated financing terms with Chartwell representatives in Tennessee.

        C.     Robert Low, Dean Hoedl, and Damian Probstfield negotiated and administered the Wolverine financing through meetings, phone calls, and emails with Chartwell representatives in Tennessee, and Low made the ultimate decision to extend financing after meeting with Chartwell representatives who traveled from Tennessee.

        D.     Bill Killian, Tony Smith, and Heath Lammey directed Killian's work on The Manning, visited the Nashville site, and communicated with Chartwell in Tennessee regarding construction progress, schedules, and invoices.

8

30.     The causes of action alleged herein arise directly from Defendants' Tennessee-directed conduct, and the harm has been experienced by Chartwell in Tennessee.

31.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to these claims occurred here, and the property at issue is located here.

## IV. FACTS

**A.      Chartwell decided to build The Manning, obtained initial construction financing, and hired Killian as its general contractor.**

32.     The Manning is Nashville's premier ultra-luxury condominium complex, situated on Woodmont Boulevard. Planning, design work, and approvals moved forward in and around 2019. According to plans, The Manning was set to consist of 36 ultra-luxury condominiums.

33.     In June 2019 and as part of the development process, Chartwell obtained a $55.8 million construction loan from Simmons Bank. That loan occurred pursuant to, among other documents, a Construction Loan Agreement dated effective as of June 17, 2019.  A true and correct copy of the Construction Loan Agreement is attached hereto as **Exhibit A**.

34.     Chartwell's owners and investors had high expectations for the project. They rightly anticipated that The Manning and its ultra-luxury offerings would stand out in Nashville's burgeoning real-estate market.

35.     In 2019, Tennessee-based Biscan Construction began conducting site work for the project, and by June 2020, Chartwell's owners and operators were speaking with Killian about serving as the project's general contractor.  On June 11, 2020, Bill Killian made an initial site visit to The Manning.  During his visit, Bill Killian inquired about Chartwell's source of financing for the project and made an unsolicited offer to connect Chartwell with Robert Low in the event Chartwell needed to obtain additional future financing for the project.

36.     During the meeting, Bill Killian conveyed the message that Killian was a well-

9

established Missouri construction company that, among other projects, had built numerous Embassy Suites hotels throughout the United States, including at least one hotel in Franklin, Tennessee. During subsequent negotiations with Killian, Bill Killian (along with other Killian representatives) represented to Chartwell that he, Bill Killian, was Killian's CEO. Based on information and belief, this statement was false. Beginning no later than on or about October 30, 2020, and continuing through on or about December 6, 2021, Robert Low served as Killian's CEO.

37.     Unbeknownst to Chartwell in 2020, Killian and the other Defendants were already working together to defraud similarly-situated developers. For instance, by 2020, Defendants had allegedly defrauded the developers of the Calypso Resort and Towers project in Panama City, Florida by conspiring to delay Killian's work on the project so that they could collect additional interest payments on Wolverine's high-interest loan to the developers. According to allegations in a subsequent lawsuit, the Defendants, without proper authorization and justification, diverted over $30 million in sales proceeds from ownership to pay Killian's unverified change orders and unauthorized requests. However, this information was not public at the time Chartwell began negotiating a construction contract with Killian. Chartwell had no way to learn, and no reason to inquire, about Killian's other misconduct until much later.

38.     As is now clear, Defendants have engaged in a pattern and practice of perpetrating this scheme, which spans multiple years (2019–ongoing) and has targeted multiple victims.

39.     During the summer of 2020, Chartwell and Killian negotiated a contract for Killian to manage construction of The Manning as the project's general contractor. On July 27, 2020, Chartwell and Killian executed an Owner-Construction Manager Agreement and a General Conditions Agreement, which are attached hereto as **Exhibit B** and **Exhibit C**, respectively.

40.     Then on or about December 17, 2020, Chartwell and Killian executed a Guaranteed

Maximum Price Amendment to the previously executed Owner-Construction Manager Agreement, which, among other things, confirmed Killian's repeated representations that it would obtain a final certificate of occupancy for The Manning by November 30, 2021 and complete the project for a guaranteed maximum price of $57,474,376. A true and correct copy of the Guaranteed Maximum Price Amendment to the Owner-Construction Manager Agreement is attached hereto as **Exhibit D**.

41.     Chartwell reasonably relied upon Killian's representations about the guaranteed maximum price and completion date. Indeed, the Owner-Construction Manager Agreement and Guaranteed Maximum Price Amendment were predicated on Killian's assurances that the guaranteed maximum price and completion date for the project would fit comfortably within the confines of Chartwell's loan from Simmons Bank.

42.     If the cost of the project substantially exceeded the guaranteed maximum price that Killian had represented, then Chartwell had few, if any, other realistic options for funding. And if the project was not complete on or shortly after the completion date of December 31, 2021, then Chartwell's loan with Simmons Bank would mature, and Chartwell would not have other sources of capital to pay off or refinance that loan. Chartwell needed to be able to sell units at The Manning beginning in 2022 to pay off its loan to Simmons Bank—and Killian knew it.

43.     Although Chartwell was unaware at the time, Killian's representations about the guaranteed maximum price and completion date were false, and Killian knew they were false.

**B.     After Killian began construction, The Manning fell behind schedule**.

44.     After Killian began work as the project's general contractor in 2021, construction of The Manning fell behind schedule, and it soon became apparent that Killian's delays would push the project's completion past Killian's November 2021 deadline and into 2022.

45.     More specifically, and despite repeatedly representing to Chartwell that it could and

would appropriately staff the project to complete The Manning as scheduled on November 30, 2021, Killian significantly understaffed the project from 2021 until abandoning it in 2024.

46.     Ultimately, Killian's mismanagement and understaffing created delays that did, in fact, result in the project not yet being completed as of Killian's December 2021 deadline. Indeed, Killian had only completed approximately 40 percent of the project when the calendar turned to 2022. A contractor working with reasonable diligence and appropriate staffing could have completed the project in 2021 or 2022.

47.      In the spring of 2022, construction continued to lag behind schedule. At that time, one of Nashville's most prominent residents signed a contract to purchase a penthouse unit with the expectation that it would be ready for occupancy by January 2023.

48.     This prominent individual's agreement to purchase that penthouse unit made the timely completion of the project urgent. Not only would the sale of that penthouse unit in 2022 allow Chartwell to begin paying off its loan to Simmons Bank on a satisfactory timeline, but the sale to that prominent individual would help market The Manning's other units to high-profile buyers. And of course, failing to deliver as promised to this prominent individual would adversely impact Chartwell's reputation and hamper its ability to sell The Manning's units.

49.     In a May 27, 2022 email to Bill Killian, one of Chartwell's owners and its co-manager, Richard Rhea, explained that the parties were "entering a particularly critical stage of the Manning" in part because that prominent individual was "calling about a completion date."

50.     On June 1, 2022, in a phone call between Chartwell's Richard Rhea and Killian's Bill Killian and Tony Smith, Smith represented that Killian would do "whatever is necessary" to complete that penthouse unit by October 15, 2022 and would ready public shared spaces, common areas, and site work by December 15, 2022. This would enable substantial completion for

temporary certificates of occupancy to issue in January 2023. Shortly thereafter, Killian circulated a written schedule and status report and punch list reflecting that timeline.

51.     Chartwell had additional staffing options available; however, these potential remedies were deferred due to Defendants' misrepresentations regarding staffing and assurances that the project would be completed as scheduled.

52.     October 2022 came and went, without Killian making adequate progress on the completion of the penthouse, site work, or common areas.  This lack of progress was caused by Killian's construction mismanagement, including its failure to properly staff the project. Indeed, staffing data compiled by Chartwell indicates that, instead of staffing the project with the 125-150 daily construction personnel necessary to complete The Manning within six months as promised, Killian typically provided a crew of 50-60 workers to the project each day. Attached as **Exhibit E** are ProCore staffing reports showing that Killian had significantly smaller crews on site than necessary to meet the construction schedule.

53.     Killian's mismanagement and failure to staff the project properly led multiple Chartwell representatives to travel to Springfield, Missouri for an "all hands on deck" meeting with Killian on November 8, 2022. During that meeting, Chartwell representatives explained their concerns with Killian's seeming inability to staff the project properly. At the meeting and otherwise, Killian's representatives repeatedly assured Chartwell—both verbally and in writing— that Killian would staff the project appropriately in order to ensure its timely completion in the first part of 2023.

54.     Chartwell reasonably relied on those representations in executing Change Order No. 019, which is attached hereto as **Exhibit F**. That Change Order established, among other things, a new gross maximum price of $65,859,426.45 and a new deadline of April 15, 2023 for

13

Killian to obtain temporary certificates of occupancy for The Manning. As noted, obtaining temporary certificates of occupancy for The Manning's units, common areas, and site improvements was important because it would allow Chartwell to close units and use unit-sale proceeds to pay off its Simmons Bank loan. Although Chartwell had no way of knowing at the time, Killian's representations during the meeting and in the subsequent change order were false when made, and Killian's representatives knew they were false. Notably, Killian's staffing issues did not improve in the coming months, and as April 2023 approached, The Manning was not on schedule for completion.

**C.     Defendants implemented their scheme by further delays that caused Chartwell to exhaust its funding, forcing Chartwell to turn to Defendants for a loan.**

55.     Killian's mismanagement, delays, staffing issues, and overcharges continued unabated into 2023.

56.     This was particularly problematic for Chartwell because, despite the project being only approximately 65 percent complete, Chartwell had exhausted funding from Simmons Bank by January 2023. To keep construction progressing, two Chartwell owners provided approximately $14 million in funding between January and May 2023.

57.     During a January 19, 2023 phone call between Killian and Chartwell to discuss the situation, Chartwell representative David Knight disclosed to the Killian team, which included Killian CEO Tony Smith and others, that having "the units, the building" in "a condition that we can sell" by May 2023 is "key" because "that revenue . . . goes forward to pay the bank." Knight likewise explained that Killian's latest delay and overcharges would require Chartwell to ask Simmons Bank for an extra 60 days to repay the loan and an additional $10 million to complete the project.

58.     Armed with confirmation that Chartwell was facing a maturing loan that it could

14

only repay through timely completion of a substantial portion of the project's units, Defendants repeated and escalated their scheme. Specifically, Heath Lammey and Tony Smith represented to Chartwell that The Manning's first 22 units would be complete and temporary certificates of occupancy would be available by May 22, 2023—in time for Chartwell to use the proceeds from those units to pay off its loan—and that Chartwell needed to pay Killian only an additional $10 million to complete the project.

59.     Despite falsely representing to Chartwell that it could complete over half of The Manning's units before the end of May 2023 for an additional $10 million, Killian continued to significantly understaff the project in early 2023. According to staffing data, Killian provided an average of only 50 workers for the project each day. *See* **Exhibit E** (ProCore data). That is far below the 125 to 150 daily workers needed to complete the project on Killian's promised timetable.

60.     When confronted with these staffing numbers and Chartwell's reasonable concern that persistent understaffing jeopardized both Killian's promised maximum cost and completion date—as well as Chartwell's ability to service its maturing loan—Tony Smith canceled a scheduled meeting with Chartwell on April 12, 2023. Yet Tony Smith did not suggest that the completion date (already extended to May 2023 for the first 22 units) might need to be extended again.

61.     Killian's delay continued into April 2023. By April 2023, it was clear to Chartwell that Killian's representation that it would complete at least 22 units by May 2023 was false, that completion of The Manning's units remained four to six months away, and that Chartwell would therefore be unable to use proceeds from selling The Manning's units to repay its loan from Simmons Bank, which was set to mature in weeks. As noted, funding from the loan had run out in January 2023, and Chartwell's owners and investors, including Joe Owen and Don Meeks, had been funding the construction with approximately $14 million in personal loans since that time.

15

62. Given the critical financial situation created by Killian's continuing mismanagement, purposeful delay, and fraudulent overcharges, Chartwell was compelled to raise with Killian the possibility that Bill Killian had first floated almost three years earlier: whether Robert Low, through Wolverine and New Prime, could refinance Chartwell's maturing loan to Simmons Bank and then finance the project's completion.

63. In an April 2023 meeting in Nashville with Bill Killian regarding the project's status, Chartwell representatives asked whether Robert Low, through Wolverine and New Prime, could help finance the project until Chartwell began closing on units. Bill Killian responded positively to the inquiry, directing Chartwell to "send your proposed financial help request . . . so we can start the process to evaluate a possible financial solution to help your funding situation."

64. In May 2023, Chartwell was contacted by Damian Probstfield. Probstfield wore multiple hats: he was a manager of Wolverine, the Chief Financial Officer of Killian, and senior financial analyst for Prime. Probstfield wanted to discuss the proposed financing and inquire about Chartwell's backup plans to fund Killian's approximately $3.6 million in unpaid invoices to Chartwell, if Chartwell could not obtain financing from Defendants.

65. At this point, Chartwell had no viable alternative option besides Wolverine to finance the project's completion. Chartwell disclosed that reality to Probstfield and continued negotiating a potential loan with Defendants.

66. As negotiations progressed, Probstfield informed Chartwell that Robert Low would ultimately decide whether to provide funding to Chartwell. Probstfield pushed for a deal in which Wolverine would assume the Simmons Bank loan, take over as the primary lender, and lend Chartwell the additional funds necessary to complete the project. Probstfield likewise stated that all disputes between Chartwell and Killian had to be resolved before Robert Low would consider

16

funding the project. That is, despite Killian's mismanagement, delays, and overcharges, Defendants stated that any financing from Wolverine would be contingent "on a documented commitment between Killian and [Chartwell] that Killian is made whole with regards to their contract value and that all change orders [and] schedule changes are approved and executed timely and all future payments are made within terms."

67.     As negotiations between Chartwell and Defendants continued into June and July of 2023, Chartwell expressed reasonable concern about Defendants' demand that Chartwell pay whatever amounts Killian claimed in order to receive Wolverine's financial lifeline. Dean Hoedl also wears hats for two of the entity defendants: he is the Chief Financial Officer for both New Prime and Wolverine. In response to Chartwell's concerns, Probstfield "pass[ed] along" Hoedl's message to Chartwell that Defendants' demand was a "common-sense statement" and non-negotiable because Robert Low is "the owner" of "both Killian and Wolverine."

68.     Because it had no realistic choice for alternative financing at this stage of the process, Chartwell continued to negotiate with the Defendants for financing.

**D.     Chartwell traveled to Springfield, Missouri to finalize a financing arrangement with Wolverine, and Defendants continued to execute their scheme.**

69.     On July 20, 2023, Chartwell representatives traveled to Springfield, Missouri to meet with Defendants about finalizing the potential financing deal.

70.     That morning, Chartwell representatives first met at Killian's headquarters with several of the individual Defendants, including Tony Smith, Bill Killian, Damian Probstfield, and Heath Lammey. Although at least one of these individuals, Damian Probstfield, was also affiliated with Wolverine and New Prime, during this meeting all of these Defendants held themselves out as speaking for Killian.

71.     During the meeting, the individual Defendants repeatedly stated that Wolverine

17

would provide short-term financing for the project only if Chartwell agreed to pay all of Killian's outstanding "change orders"—which were nothing more than demands for money that Killian had not earned and was not owed. More specifically, Tony Smith asserted that negotiations were "at a boiling point" and the parties needed to "work out" their disagreements about change orders before "crossing the road" to meet with Robert Low and Wolverine.

72.     Damian Probstfield, who simultaneously served in roles at Killian, Wolverine, and New Prime, emphasized the point, explaining that "the biggest thing" the Wolverine team would want to hear is that "there's no current issues" between Chartwell and Killian. Tony Smith then sought to induce Chartwell to accept financing from Wolverine by reassuring Chartwell representatives that once "the money problem gets solved," the "construction problem" will "solve itself."

73.     With no other feasible options, Chartwell signed the change orders increasing costs, as presented by the Defendants, and thereafter "crossed the road" and met with Robert Low and other Defendants, including Low, Smith, Lammey, and Hoedl, at New Prime's headquarters. Low began the meeting by stating that he was just "a poor dumb trucker up here in Missouri"—despite being a billionaire who owns thoroughbred race horses, multiple restaurants, a golf course, and a Biloxi, Mississippi casino, and who lives in a 70,000 square foot mansion known as "Primatara," one of the largest private residences in the United States. Low stated that he was not an expert "on financing real estate and, you know, the value, the equity." Low then reiterated that Killian "expected to get paid" all amounts claimed, and that if necessary Killian would fight it out in court.

74.     At that point, Killian CEO Tony Smith interjected and explained that Chartwell would pay all charges and invoices Killian claimed were due, and that the project would therefore "wrap up" in "late October" of 2023 with "a few straggling pieces." When he made these

representations, Tony Smith and the other Defendants knew they were false. Indeed, and unbeknownst to Chartwell, Low was intimately familiar with The Manning's construction status because, upon information and belief, he attended regular meetings with Smith, Probstfield, and other Killian employees regarding Killian projects, including The Manning.

75.    The parties proceeded to discuss the details of a financing arrangement by which Wolverine would assume the Simmons Bank loan and finance the remaining project cost.

76.    During those discussions, Low stated that, given the increase in Nashville real estate prices, sales of The Manning's completed units would make the project significantly more valuable than Chartwell had originally anticipated. Low's admission shows that Defendants knew that, as part of a financing deal, Defendants could take a first mortgage security interest that would allow (a) Killian to continue to overcharge Chartwell with fraudulent change orders and (b) Wolverine to impose above-market interest and fees, with only limited downside risk.

77.    As negotiations continued over the following weeks, Chartwell and the Defendants met again on August 8, 2023, in Springfield, Missouri—with counsel for all parties present.

78.    Chartwell began the meeting by stating it was looking for Killian to "commit" to a firm budget, schedule, and completion date for the project. Chartwell's counsel explained that because Chartwell was out of money, and because it would use unit-sale proceeds to repay any loan from Wolverine, Chartwell had to have Killian's commitment on a budget and a "real date" for the project's completion before Chartwell could accept a loan from Wolverine.

79.    The Defendants, including Tony Smith and Heath Lammey, responded by making multiple material false statements to assuage Chartwell's concerns about The Manning's budget and completion date and to induce Chartwell to enter into a financing arrangement with Wolverine.

80.    For instance, Tony Smith and Heath Lammey represented that The Manning's

public spaces would be complete by the end of November 2023, and after negotiating a 30-day extension for weather- and inspection-related delays, Smith assured Chartwell that December 31, 2023 was "a hard completion date" for the project. These representations were significant because, as Chartwell representatives stated at the meeting, Killian's timely completion of The Manning's public spaces and site improvements would allow Chartwell to obtain temporary certificates of occupancy, sell condominium units, and use the proceeds to repay Wolverine's loan.

81.     When Chartwell's counsel asked Smith whether Killian could overcome its prior delay problems, he responded that those issues would be "resolved" through the financing arrangement with Wolverine. Smith and the other Wolverine and Killian representatives present at the meeting knew this statement was false.

82.     Smith, Lammey, and Probstfield likewise falsely represented that Wolverine's loan would fund all remaining project costs without Chartwell making any additional capital contributions, and Smith and Lammey represented that Killian would not send Chartwell any additional requests for payment on undisclosed change orders. As Smith explained to Chartwell, "everything" is "going to be behind us once you sign the new loan documents."

83.     Given these assurances, Chartwell continued negotiating a financing arrangement with Wolverine. As the loan was being finalized in September 2023, Smith represented that Killian would create and give Chartwell a construction schedule with the promised completion dates on or about September 12, 2023. Smith knew this statement was false when he made it. Killian never prepared or shared a construction schedule with Chartwell in September 2023 or otherwise.

84.     As loan negotiations in August/September 2023 continued, Smith shut down all Killian's work on The Manning. Unbelievably, Smith did this even though Killian had committed to substantially completing the project by December 31, 2023, and there was no legitimate reason

20

for the shutdown. This unforeseen directive virtually destroyed the possibility that the project would be completed by the Defendants' promised December 31, 2023 completion date. Acting with the other Defendants, Smith deliberately made this decision to cause that delay and to advance the scheme described herein.

85.     On September 29, 2023, Chartwell closed the $93 million loan with Wolverine, which paid off the Simmons Bank construction loan. The loan contained the following terms: a maturity date of May 31, 2024; Chartwell had to repay at least $50 million by April 30, 2024; a fixed interest rate of 13 percent per annum; and a first deed of trust on The Manning in favor of Wolverine. As part of this loan agreement, Wolverine charged Chartwell a $465,000 origination fee. The loan agreement is set forth in, among other documents, an Amended and Restated Construction Loan Agreement among Chartwell and Wolverine, a true and correct copy of which is attached hereto as **Exhibit G**.

86.     Contemporaneously to the September 29, 2023 loan agreement, Chartwell and Killian executed the Second Guaranteed Maximum Price Amendment to the construction contract. The Second Guaranteed Maximum Price Amendment, which is attached hereto as **Exhibit H**, increased the guaranteed gross maximum price of constructing The Manning to $82,265,672.31 and established two deadlines for Killian to deliver temporary certificates of occupancy for the project. Specifically, the Second Guaranteed Maximum Price Amendment required Killian to obtain temporary certificates of occupancy for (a) all The Manning's common areas, site work, and 22 condominium units on or before March 7, 2024 and (b) the remaining 11 condominium units on or before March 22, 2024.

**E.      Defendants further escalated their scheme by continuing to delay completion of the project after providing financing to Chartwell.**

87.      In the weeks after September 29, 2023, Defendants' conduct clearly demonstrated that several representations they had just recently made to induce Chartwell to enter into the financing arrangement with Wolverine, as well as in the Second Guaranteed Maximum Price Amendment with Killian, were knowingly false when made.

88.      First, within six weeks of the loan's closing, Killian Project Executive Heath Lammey presented Chartwell with more than $3.7 million in "change orders" (overcharges) that pre-dated the loan, and that had never previously been disclosed to Chartwell. That contradicted Defendants' explicit representations that the $93 million loan would fund the total cost of the project and that Killian did not possess any undisclosed change orders as of the September 29, 2023 loan closing. The $3.7 million in charge orders exceeded the maximum $82 million that Defendants had represented—only weeks earlier—were necessary to complete the construction. When confronted about this blatant misrepresentation, the Defendants implausibly claimed that Killian and Chartwell had "a gentleman's agreement" not to disclose the $3.7 million in change orders that pre-dated the loan.

89.      Killian's presentation of these previously undisclosed change orders to Chartwell was significant, for several reasons. First, the change orders demonstrated that Defendants had lied on August 8, 2023 and on September 29, 2023 when they represented to Chartwell that Killian would not submit additional undisclosed change orders for work that pre-dated the loan's closing. Second, the change orders showed that Defendants had intentionally misled Chartwell during loan negotiations by representing that the $93 million loan would fund the entire project. Third, the change orders made clear that Chartwell would now need *additional* financing from Wolverine to complete The Manning. Unbelievably, by mid-April 2024, Killian had submitted more than $11

22

million dollars in undocumented and unjustified change orders.

90.     Upon information and belief, New Prime's treasury, via Hoedl, approved capital allocations to Wolverine specifically for Chartwell in proximity to the Springfield meetings and September 29, 2023 loan closing, with New Prime's knowledge of the pre-closing undisclosed change orders and schedule misrepresentations.

91.     Defendant's promise that Wolverine's loan would "resolve" Killian's staffing issues on the project was also quickly proven false. Instead of staffing the project at appropriate levels, Killian continued to purposefully delay the project and perpetrate Defendants' scheme.

92.     Although Chartwell is not a general contractor, Chartwell went above and beyond by giving Killian the names of subcontractors that it could hire to help complete the project.

93.     But in a November 2023 meeting at the construction site, Project Superintendent (and the top Killian employee in Tennessee) Clinton Jones disclosed to Chartwell representatives that Killian's leadership would not allow him to hire the subcontractors suggested by Chartwell. Jones likewise explained that Killian's "front office" had "done nothing but hinder [him] on th[e] whole project," and that Killian CEO Tony Smith would not even allow Brad Holgate, Killian's Vice President of Operations, to visit the site.

94.     Also proven false was Defendants' promise that a substantial portion of The Manning's units would be complete and the sales could be closed well before the Wolverine loan matured on May 31, 2024. Defendants' promised completion dates came and went—yet again— without Killian making any substantial progress on the project.

**F.     Defendants continued their mismanagement, delay, and overcharging, and Chartwell was forced to increase its line of credit from Wolverine.**

95.     Between January and March 2024, Killian's delays continued, and Killian issued additional "change orders" to Chartwell that were blatant overcharges. Despite Defendants'

explicit representations to the contrary, the total cost of the project was now $104 million—$11 million in excess of the $93 million amount that Defendants had just recently represented would constitute the maximum total cost of project.

96.     Killian's delays and overcharges compelled Chartwell to send notices of default to Killian and confer with Wolverine about increasing its line of credit to complete the project, yet again—just as Defendants had intended all along. During a March 15, 2024 phone call, Dean Hoedl offered that Wolverine would increase its line of credit "predicated" on Chartwell paying Killian's "change orders" and using Killian to complete the project. To be clear, these "change orders" were *not* justifiable increased costs due to changes requested by Chartwell, but instead false and/or overcharged amounts.

97.     At or around this time, Killian CEO Tony Smith, who participated in the call with Hoedl and Damian Probstfield, falsely represented to Chartwell that Killian could be finished with the project within 150 days.

98.     Thus, Defendants again placed a proverbial gun to Chartwell's head, forcing Chartwell to choose between incurring more debt with Wolverine or facing the specter of Wolverine (and by extension, New Prime) foreclosing on the unfinished project that, according to Defendants' repeated assurances, was finally close to completion.

## G.     Killian abandoned the project, and Chartwell is forced to incur more debt and hire another general contractor to finish the job.

99.     Killian representatives committed the coup de grâce of the Defendant's scheme on April 19, 2024 by abandoning and thereby sabotaging the project when it was approximately 85 percent complete.

100.     Both Killian's abandonment of the project and its numerous prior breaches of the parties' construction contract led Chartwell to send Killian a Notice of Termination for Cause on

24

April 23, 2024.

101.    On May 15, 2024, Wolverine accelerated its loan and demanded immediate payment of $94,344,261.02. Wolverine also gave Chartwell formal notice that it intended to commence the exercise of remedies against its collateral.

102.    In In June 2024, the parties ultimately agreed that Wolverine would increase its loan to Chartwell by an additional $22.5 million. Under this agreement, the line of credit increased from $93 million to $115.5 million. Wolverine exacted another origination fee in the amount of $450,000. This agreement occurred pursuant to, among other documents, an Omnibus First Amendment to Loan Documents effective as of June 21, 2024, a true and correct copy of which is attached hereto as Exhibit I.

103.    Following Killian's termination, Chartwell hired the Southern Building Group, Inc. ("SBG") to complete The Manning. Killian purposefully created roadblocks to SBG's completion of The Manning by denying Chartwell access to the project's records and canceling all building permits for the project that had been issued by the Metro Nashville Codes Department. Killian also transmitted correspondence to subcontractors and suppliers who had provided labor, materials, equipment, and services to the project, directing them to terminate all existing downstream subcontracts and purchase orders. These acts ensured completion of The Manning would be significantly delayed, and that the Defendants would receive millions of dollars more in interest payments from Chartwell.

104.    Killian's refusal to share the project's records, cancellation of all building permits, and communications to subcontractors and suppliers both complicated SBG's ability to begin work on The Manning and made it impossible for SBG to complete The Manning by the March 31, 2025 maturity date set forth in the June 21, 2024 Omnibus First Amendment to Loan Documents.

25

105.    Due to the delays caused by Killian's abandonment, SBG was able to begin preliminary work on the project in June 2024 and was able to commence regular construction activities in September. It began issuing temporary certificates of occupancy for The Manning's units in May 2025.

**H.    Project superintendent Clinton Jones disclosed to Chartwell that defendants would not allow him to finish the project.**

106.    In June 2024, the parties ultimately agreed that Wolverine would increase its loan to Chartwell by an additional $22.5 million. Under this agreement, the line of credit increased from $93 million to $115.5 million. Wolverine exacted another origination fee in the amount of $450,000. This agreement occurred pursuant to, among other documents, an Omnibus First Amendment to Loan Documents effective as of June 21, 2024, a true and correct copy of which is attached hereto as Exhibit I.

107.    On May 13, 2024, Joe Owen of Chartwell met with Project Superintendent Clinton Jones, who, as noted, was Killian's top Tennessee-based employee. In the meeting, Jones made several remarkable admissions about Killian that shed light on Defendants' fraudulent scheme.

108.    Specifically, Jones described Killian CEO Tony Smith as "a used car salesman," who "tells you what you want to hear in the moment," and admitted that Killian had made multiple misrepresentations by promising since 2022 that The Manning's completion was imminent and by asserting that it would adequately staff the project.

109.    Jones also disclosed that Killian had never given him the resources necessary to finish the project, that Killian had "handcuffed" his efforts to complete the project, and that, without Killian's delays, the project would have been completed "a long time ago."

110.    Owens' conversation with Jones also revealed that although Killian Vice President of Operations Brad Holgate knew that Killian had not adequately staffed the project, Killian never

26

took any corrective measures. This was all part of Defendants' fraudulent scheme.

**I.    Because Killian had failed to finish the project and Chartwell needed additional funds to do so, Chartwell had to borrow even more money from Wolverine.**

111.    Because Killian made it impossible for SBG to complete The Manning by the March 31, 2025 maturity date set forth in the June 21, 2024 Omnibus First Amendment to Loan Documents, Chartwell was forced to increase its line of credit with Wolverine yet again—this time by an additional $12.05 million. This increased debt was necessary not only to pay SBG to finish the project, but also so that Chartwell could afford to make interest payments to Wolverine on the approximately $115.5 million Wolverine had already forced Chartwell to incur. Wolverine also exacted another origination fee in the amount of $1.0 million.

112.    This increased line of credit occurred pursuant to, among other documents, an Omnibus Second Amendment to Loan Documents effective as of March 10, 2025, a true and correct copy of which is attached hereto as **Exhibit J**.

113.    As it worked to complete The Manning, SBG discovered that much of Killian's work was defective and had to repaired or replaced altogether. Killian's defective work caused further delay in the completion of The Manning and increased costs of more than $5 million. To pay these increased costs and make interest payments to Wolverine, in May 2025, Chartwell was forced to increase its line of credit with Wolverine yet again, this time to a maximum principal amount of $131,455,000. This increased line of credit occurred pursuant to, among other documents, an Omnibus Third Amendment to Loan Documents effective as of May 2, 2025, a true and correct copy of which is attached hereto as **Exhibit K**.

114.    Certain loan agreements, including the Second and Third Loan Agreements with Wolverine, purported to require Chartwell to release certain claims against certain parties. Those releases are void and/or inapplicable to the claims asserted herein because, among other reasons:

27

(i) the claims asserted herein are outside the scope of those releases; (ii) those releases do not expressly release claims sounding in and/or related to fraud, as required under applicable law; (iii) the releases were procured by Defendants' fraudulent scheme; and (iv) the releases were procured by Defendants' scheme placing Chartwell in a position of economic duress.

115. On September 30, 2025, Chartwell paid Wolverine $1,450,000 in origination fees for the Omnibus First and Second Amendments to Loan Documents.

116. On October 6, 2025, Wolverine purported to declare an event of default, declared the entire loan amount to Chartwell accelerated and due immediately, and increased the interest rate from 13 percent to 16 percent. As a result, Chartwell has purportedly been incurring interest to Wolverine at the rate of 16 percent since October 6, 2025.

**J.  Defendants' fraudulent scheme has caused Chartwell to incur and suffer tens of millions of dollars of damages.**

117. In sum, Defendants repeatedly and knowingly made misrepresentations (including by phone and email, using interstate wire) regarding The Manning's completion date, the cost of construction, and the adequacy of Wolverine's loans to fund the project—all in support of their scheme to exhaust Chartwell's construction loan, charge excess prices for work not performed, and obtain substantial interest payments and fees on high-interest loans.

118. Over the past several months, Chartwell has sold condominium units to satisfied purchasers. All net proceeds have gone to Wolverine. Based on Wolverine's most recent statements to Chartwell and its own calculations, the claimed loan balance to Wolverine remains at nearly $100 million—even after applying these sales proceeds.

119. To date, Chartwell has paid Wolverine a total amount of approximately $33 million in interest. For perspective, Chartwell has recently been paying Wolverine more than $1 million in interest *each month*. Chartwell has also paid Wolverine approximately $2 million in fees. None of

28

these amounts would have been necessary but for Defendants' fraudulent scheme.

120. In addition, Chartwell has paid Killian approximately $10 million for work that was defective or never completed. Chartwell would have never paid those amounts but for Defendants' unlawful conduct and fraudulent scheme. Those amounts are also damages that Chartwell has incurred as a result of Defendants' conduct and scheme.

121. As a direct and proximate result of Defendants' deliberate delays and abandonment, Chartwell has been forced to incur substantially increased carrying costs for The Manning over a far longer period than would have been necessary, causing at least $5 million in additional harm. These carrying costs include, without limitation, salaries, rent, professional fees, property taxes, insurance premiums, utilities, and security costs.

122. Accordingly, Chartwell is entitled to a judgment awarding it approximately $50 million in compensatory damages, which amount must be trebled as a matter of law, plus consequential and punitive damages, together with attorney's fees and costs. The total damages sought by Chartwell against Defendants, jointly and severally, are in excess of $200 million.

**K.  Wolverine's foreclosure of The Manning would cause irreparable harm to Chartwell for which no adequate remedy exists at law.**

123. The Manning is a singular, ultra-luxury condominium project, comprising 36 high-end residences with unit sizes and finishes tailored to a narrow buyer segment; its market positioning and location are unique and cannot be replicated by Chartwell elsewhere. Loss of the collateral through foreclosure would permanently strip Chartwell of control over completion and quality, dissolve its ability to curate brand standards, and sever critical purchaser relationships—all harms that cannot be undone by a later damages award.

124. Chartwell's sales and marketing strategy relies on the project's exclusivity and the confidence of high-profile buyers whose involvement enhances market traction; foreclosure would

29

irreparably damage Chartwell's reputation with these purchasers, erode goodwill, and impede future developments. These downstream harms to reputation and goodwill extend far beyond the financial loss tied to any single unit or the property as a whole and are inherently non-compensable.

125.     Wolverine has asserted a deed of trust securing its loans, has accelerated the indebtedness, and has invoked default-rate interest; the parties actively dispute whether Wolverine may foreclose—a remedy that, if exercised, would irrevocably transfer control of The Manning, destroy Chartwell's ability to perform under existing agreements, and cloud titles and warranties—injuries that cannot be fully measured or remedied after the fact.

126.     Wolverine's deed of trust also includes a waiver of the right of redemption, which purports to permanently deprive Chartwell of the ability to redeem its interest in the property after foreclosure proceedings and sale. Put differently, Wolverine's foreclosure of The Manning—which would serve as the final stage and consummation of Defendants' elaborate fraudulent scheme—would also seek to foreclose any opportunity for Chartwell to make itself whole again in wake of its crippling and insurmountable indebtedness to Wolverine.

127.     Chartwell has continued selling units, and all net proceeds have been remitted to Wolverine, yet Wolverine still claims a loan balance near $100 million and has charged extraordinary interest and fees, including default-rate interest. If foreclosure is allowed while these disputes are pending, Chartwell will be deprived of the very asset and enterprise it seeks to vindicate, rendering any final judgment hollow. An award of damages cannot substitute for the loss of this unique property, the associated reputational, brand, and purchaser-relationship harms, and the ability to Chartwell to enforce any judgment in its favor.

128.     The balance of equities and the public interest favor maintaining the status quo. Preventing foreclosure preserves a unique asset, protects unit purchasers and the surrounding

community from the disruption of a contested foreclosure, and facilitates orderly adjudication of serious claims of racketeering, fraud, conspiracy, duress, and usury. Meanwhile, Wolverine remains protected by ongoing interest accruals, an accounting of unit-sale proceeds, and adequate security in the property.

## V.  CAUSES OF ACTION

### COUNT I:  RICO ENTERPRISE (18 U.S.C. § 1962(C))
### (AGAINST ALL DEFENDANTS)

129.    Chartwell incorporates all prior paragraphs by reference.

130.    Defendants, together with Killian Contractor, Inc. and KCC Contractor, Inc., constitute an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). The enterprise operated with a common purpose: to defraud developers and owners by using Killian to delay construction and submit inflated invoices, exhausting developers' financing, and then using Wolverine to provide high-interest loans that Defendants knew could not be repaid before maturity—enabling Defendants to extract excessive payments, interest, and fees.

131.    At all relevant times, the enterprise (a) had an existence separate and distinct from each of the Defendants; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; (c) was an ongoing and continuing organization consisting of individuals and legal entities; (d) was characterized by interpersonal relationships among the Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Although Wolverine, New Prime, and Killian had common ownership, Killian and each of those Defendants performed distinct roles that helped facilitate the fraudulent scheme.

132.    At all relevant times, the enterprise was engaged in, and its activities affected, interstate commerce because the Defendants are from a different state (Missouri) than Chartwell (Tennessee) and used the internet, mail, telephone, and other channels and instrumentalities of

31

interstate commerce to conduct the above-described fraudulent enterprise.

133.    Defendants conducted and participated in the enterprise's conduct and affairs through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(5), consisting of multiple violations of the federal wire fraud and mail fraud statutes, 18 U.S.C. §§ 1343 and 1341, each of which constitutes a predicate act of racketeering activity pursuant to 18 U.S.C. § 1961(1).

134.    Representative predicate acts of wire/mail fraud include: (a) the June 1, 2022 telephone call (Smith to Rhea) promising October/December completions; (b) the January 19, 2023 teleconference (Smith and Lammey to Chartwell) promising 22 units by May 22, 2023 for approximately an additional $10 million; (c) the May–July 2023 emails/calls (Probstfield/Hoedl) conditioning funding on paying disputed change orders and retaining Killian, and assuring completion within loan maturity; (d) the July 20, 2023 in-person meetings asserting that Wolverine's financing would "solve" the construction problems (Smith to Chartwell), and that the project would be completed by late October (Smith and Low to Chartwell); (e) the August 8, 2023 representation that no additional pre-loan change orders would be submitted (Smith to Chartwell), that the project would be complete by December 31, 2023 (Smith and Lammey to Chartwell), and that Wolverine's loan would completely fund the project's remaining costs (Smith and Probstfield to Chartwell); (f) the failure to circulate of a promised completion schedule in September 2023; (g) the October–November 2023 transmittal of $3.7 million of pre-loan closing change orders; and (h) the March 15, 2024 phone call (Hoedl and Smith) representing that it would take less than 150 days to complete the project, to induce Chartwell to enter loan agreements with Wolverine. Each of those assertions by Defendants was knowingly false when made.

135.    The predicate acts were interrelated and pose a threat of continued racketeering; thus, they constitute a "pattern of racketeering activity." Florida developers and owners have

32

alleged substantially similar conduct by these Defendants, further evidencing the pattern.

136. Each Defendant has benefited from this scheme. Wolverine and New Prime have benefited from the scheme because Wolverine received tens of millions of dollars in above-market interest payments from Chartwell, and Wolverine transferred some of those funds to New Prime. The Defendants who are Killian's owners and managers have benefited because the scheme induced Chartwell to pay Killian millions of dollars for defective and/or illusory work. Robert Low and other individual Defendants have benefited from both sides of the scheme: in their capacity as owners of the entity Defendants, they received monetary distributions of the ill-gotten gains from Chartwell; and in their capacity as employees of the entity Defendants, they received compensation they would not have received but for the ill-gotten gains from Chartwell.

137. Wolverine and New Prime are liable for the conduct of their respective officers and employees under respondeat superior. In addition, the statute of limitations was tolled by fraudulent concealment and the discovery rule at least until Chartwell discovered Defendants' concealed change orders and the falsity of their representations following the September 2023 closing. Defendants' concealment continued into 2024, including the March 15, 2024 representation that Killian would finish the project within 150 days if Wolverine increased credit, further delaying discovery of the full scope of the Defendants' fraud and racketeering activity.

138. As a result of these actions, Chartwell has suffered damages as described herein and in an amount to be proven at trial, which amount is approximately $50 million, and which shall be automatically trebled as a matter of law. *See* 18 U.S.C. § 1964 (providing that plaintiff "shall recover threefold the damages he sustains"). Each of the Defendants is jointly and severally liable for these damages under applicable law.

## COUNT II:  FRAUD, PROMISSORY FRAUD, FRAUDULENT CONCEALMENT, AND FRAUDULENT INDUCEMENT
### (AGAINST ALL DEFENDANTS)

139.    Chartwell incorporates all prior paragraphs by reference.

140.    Defendants made numerous false representation of fact to Chartwell and concealed material facts from Chartwell, including without limitation: (i) during negotiations in 2020, Killian represented a guaranteed maximum price of approximately $57 million and a November 30, 2021 completion date; (ii) on June 1, 2022 Tony Smith stated Killian would do "whatever is necessary" to complete the penthouse by October 15, 2022 and ready public shared spaces by December 15, 2022; (iii) on November 8, 2022, Killian representatives assured Chartwell it would staff appropriately to ensure completion; (iv) on January 19, 2023, Smith and Lammey represented the first 22 units would be complete by May 22, 2023 for only an additional $10 million; (v) the May–July 2023 emails/calls (Probstfield/Hoedl) conditioning funding on paying disputed change orders and retaining Killian, and assuring completion within loan maturity; (vi) the July 20, 2023 in person meetings asserting that Wolverine's financing would "solve" the construction problems (Smith to Chartwell), and that the project would be completed by late October (Smith and Low to Chartwell); (vii) in August 2023, Killian and Wolverine representatives represented that no additional pre-loan change orders would be submitted and that Wolverine's loan would fully fund completion; (viii) in September 2023, Tony Smith falsely represented that Killian would circulate a schedule outlining the project's completion timing; (ix) in October-November 2023, Defendants' transmittal of more than $3.7 million in pre-closing change orders revealed they had previously concealed material pre-closing change orders and purported cost overruns, despite prior assurances that the $93 million loan would be sufficient; and (x) on March 15, 2024, Dean Hoedl and Tony Smith represented that Killian would finish the project within 150 days.

34

141. Defendants' foregoing representations were false when made.

142. Defendants' foregoing representations were in regard to material facts.

143. Defendants made the foregoing false representations knowing they were false, without regard to their truth or falsity, and/or without exercising reasonable care.

144. Regarding representations that involved Defendants' future conduct, Defendants knew that Defendants would not perform such future conduct, and Defendants had no present intention of performing such future conduct when those promises were made.

145. Defendants made the foregoing false representations to enrich themselves from the funds obtained from Chartwell through the above-described fraudulent scheme.

146. In reasonable reliance on Defendants' above-described misrepresentations, Chartwell expended tens of millions of dollars paying Killian's overcharges and making above-market interest payments on loans predicated on the Defendant's fraudulent misrepresentations.

147. Regarding the information that Defendants fraudulently concealed from Chartwell, Defendants had a duty to disclose that information to Chartwell, and Chartwell could not have discovered that information despite exercising reasonable care and diligence.

148. Defendants committed fraudulent inducement because their false statements and concealments were made to induce Chartwell to enter into one or more contracts, including without limitation the loan agreements and related agreements with Wolverine, and Chartwell in fact entered such contracts in reasonable reliance on those false statements and concealments.

149. Chartwell's fraud claims are timely under Tennessee's discovery rule.

150. Further, the statute of limitations was tolled until Chartwell discovered, or through reasonable diligence should have discovered, the fraud or sufficient facts to put it on notice. Chartwell did not have actual knowledge—and reasonably could not have discovered—

35

Defendants' concealed pre-closing change orders and the falsity of Defendants' schedule and "fully funded" representations until after the September 29, 2023 closing, when Defendants transmitted more than $3.7 million in previously undisclosed pre-closing change orders (October–November 2023) and continued to understaff the project notwithstanding their completion assurances.

151.    Fraudulent concealment tolling further applies because Defendants affirmatively misrepresented and concealed material facts—including the existence of pre-closing change orders and the true cost-to-complete—and undertook acts to prevent inquiry and investigation (e.g., conditioning financing on payment of disputed change orders while denying their existence pre-closing; representing imminent completion dates while restricting staffing and resources). The limitations period was therefore tolled until Chartwell, in the exercise of reasonable diligence, discovered or should have discovered the concealment through the October–November 2023 disclosures and later admissions. Defendants' ongoing concealment and new inducements continued into 2024, including the March 15, 2024 representation that Killian would finish within 150 days if Wolverine increased credit, further delaying discovery of the full scope of the fraud.

152.    Wolverine is legally responsible for the above-described conduct of Probstfield and Hoedl pursuant to the doctrine of *respondeat superior* and the laws of agency because, at the time Probstfield and Hoedl committed the above-described fraud, they were acting in the course and scope of their employment with Wolverine.

153.    New Prime is legally responsible for the above-described conduct of Low, Probstfield, and Hoedl pursuant to the doctrine of *respondeat superior* and the laws of agency because, at the time Low Probstfield, and Hoedl committed the above-described fraud, they were acting in the course and scope of their employment with New Prime.

154.    As a result of Defendants' fraud, promissory fraud, and concealment, Chartwell has

suffered damages in an amount to be proven at trial, in an amount no less than $200 million.

155. As a result of Defendants' fraudulent inducement, Chartwell's loan agreements with Wolverine are void and unenforceable.

## COUNT III:  CIVIL CONSPIRACY
## (AGAINST ALL DEFENDANTS)

156. Chartwell incorporates all prior paragraphs by reference.

157. Defendants agreed and acted in concert to execute a unified scheme under which Killian would deliberately delay construction and submit inflated and/or illusory invoices, while Wolverine—funded by New Prime—would leverage those delays and invoices to coerce Chartwell into high-interest, short-maturity financing that Defendants knew would not carry the project to completion; the conspiracy's unlawful objectives included committing fraud, extracting payments for defective and/or unperformed work, and securing above-market interest and fees by misrepresenting schedule, budget, and financing sufficiency.

158. The named and unnamed conspirators comprised separate legal entities and individuals occupying cross-functional roles—Killian (general contractor), Wolverine (lender), and New Prime (funding source)—directed and owned by Robert Low, with material participation by Bill Killian, Tony Smith, Damian Probstfield, Dean Hoedl, and Heath Lammey; these actors coordinated across companies in meetings, calls, and emails directed at Chartwell to advance the shared scheme and to align contracting, staffing, invoicing, and lending terms to Defendants' collective advantage.

159. In furtherance of the conspiracy, Defendants orchestrated and executed multiple overt acts of fraud, including: (a) promising on June 1, 2022 to do "whatever is necessary" to complete the penthouse and public areas by October and December 2022 while persistently understaffing the site; (b) assuring at a November 8, 2022 meeting that Killian would staff

37

appropriately despite knowing it would not; (c) representing on January 19, 2023 that 22 units would be complete by May 22, 2023 for an additional approximately $10 million while maintaining inadequate staffing; and (d) refusing to meet or adjust timelines when pressed, thereby manufacturing urgency against a maturing bank loan.

160.    Continuing their coordinated and overt acts, Defendants conditioned access to Wolverine / New Prime financing on Chartwell paying Killian's disputed invoices and retaining Killian despite nonperformance, with Probstfield/Hoedl stating that Low would decide financing and emphasizing that demands were non-negotiable because Low was the owner and source of funds for both Killian and Wolverine; Defendants then used these conditions to align construction and lending to their shared plan to extract payments and interest from Chartwell.

161.    On July 20, 2023, Defendants staged back-to-back meetings in Springfield: first at Killian's headquarters to insist that Wolverine would fund the project only if Chartwell paid all Killian "change orders," and then at New Prime with Low present, where Tony Smith falsely promised the project would "wrap up" by late October 2023. The Defendants made similar representations at an August 8, 2023 meeting in Springfield. These meetings exemplify the concerted, cross-entity coordination between contracting and lending arms to induce reliance and secure the high-interest financing. As loan terms were finalized, Defendants falsely represented that the September 2023 Wolverine loan (approximately $93 million) would fully fund completion, that pre-closing change orders were resolved, and that Killian would not submit additional pre-loan change orders; Defendants also promised, but never circulated, a final completion schedule in September 2023 to induce closing, and within weeks sent over $3.7 million in previously concealed pre-closing change orders—contradicting their assurances and furthering the conspiracy's unlawful objective.

38

162.     Defendants prolonged delays post-closing to necessitate more debt, while internal admissions by Killian's on-site superintendent in November 2023 confirmed that Killian's leadership hindered staffing and barred needed resources—conduct consistent with the conspiracy's strategy to delay and coerce additional financing and payments.

163.     In early 2024, Defendants escalated the scheme through additional overt acts by asserting that total costs exceeded prior representations and, on March 15, 2024, Hoedl and Tony Smith promised Killian would finish within 150 days if Wolverine increased credit—again conditioning funding on payment of disputed change orders and retention of Killian, inducing Chartwell to increase its borrowing while Defendants knew completion would not occur on the asserted timeline. The Defendants' scheme culminated in Killian abandoning the project on April 19, 2024 and canceling all building permits, thereby significantly delaying a subsequent contractors' efforts to complete the project.

164.     The civil conspiracy claim is predicated on actionable underlying torts, including fraud, promissory fraud, fraudulent concealment, fraudulent inducement, and negligent misrepresentation, as alleged herein.

165.     Each conspirator possessed the intent to accomplish the common purpose and acted with knowledge of the others' intent, as evidenced by coordinated meetings, calls, emails, and loan-closing communications aligning delayed staffing, undisclosed change orders, and high-interest financing to extract payments and leverage against Chartwell.

166.     Each of the named conspirators is jointly and severally liable for all damages caused by the wrongful acts of every co-conspirator undertaken in furtherance of the common scheme.

167.     Defendants' civil conspiracy proximately caused Chartwell's injuries.

168.     As a direct and foreseeable result of Defendants' agreement and the foregoing overt

acts, Chartwell incurred tens of millions of dollars in damages in a total amount to be proven at trial, including payments on inflated and/or illusory change orders to Killian and substantial, above-market interest, fees, and costs to Wolverine on loans induced by coordinated misrepresentations regarding schedule, completion cost, and financing sufficiency.

### COUNT IV: PIERCING CORPORATE VEIL
### (AGAINST LOW, WOLVERINE, AND NEW PRIME)

169.    Chartwell incorporates all prior paragraphs by reference.

170.    Low exercised complete dominion and control over Killian, Wolverine, and New Prime—not only over their finances, but also over their policies and operations—such that, with respect to the fraudulent scheme directed at Chartwell, these entities had no separate mind, will, or existence of their own independent of Low's direction. Low's dominion is evidenced by: (a) his simultaneous positions as CEO and majority shareholder of New Prime, majority shareholder and former CEO of Killian, and 50 percent owner of Wolverine; (b) Defendants' statement that demands were "non-negotiable" because Low is "the owner" of "both Killian and Wolverine"; (c) multiple overlapping officers across all entities; (d) shared business location for Wolverine and New Prime in Springfield, Missouri; and, (e) upon information and belief, commingling of funds among the entities, undercapitalization of Killian, and diversion of corporate assets to Wolverine, New Prime, and Low personally.

171.    Low used his control over these entities to perpetrate a coordinated fraudulent scheme whereby Killian made false representations to Chartwell and deliberately delayed construction and submitted inflated invoices, and Wolverine leveraged those delays to coerce Chartwell into accepting predatory financing—extracting tens of millions of dollars that flowed to Low's benefit. This conduct constitutes affirmative fraud through material misrepresentations, fraudulent concealment, and economic duress, not mere breach of contract.

40

172.     Low's control and wrongful conduct proximately caused Chartwell's damages as alleged herein. But for Low's orchestration of the fraudulent scheme, Chartwell would not have contracted with Killian and Wolverine, obtained predatory financing from Wolverine, or made the payments that serve as a portion of its damages.

173.     For purposes of holding Low personally liable and imposing joint liability among the corporate Defendants, Killian, Wolverine, and New Prime operated under Low's unified control, and adherence to the fiction of their separate legal existence would sanction fraud and promote injustice.  The Court should pierce their corporate veils and hold Low personally liable, and should treat the corporate Defendants as jointly and severally liable for each other's debts and for Killian's debts arising from the conduct alleged herein.

### COUNT V:  NEGLIGENT MISREPRESENTATION
### (AGAINST ALL DEFENDANTS)

174.     Chartwell incorporates all prior paragraphs by reference.

175.     Defendants supplied information to Chartwell. Defendants provided project-guidance information regarding schedule, staffing, budget, change-order status, and financing sufficiency, including: June 1, 2022 promises to finish the penthouse by October 15, 2022 and public areas by December 15, 2022; November 8, 2022 staffing assurances; January 19, 2023 claims that 22 units would be complete by May 22, 2023 for ~$10 million; July 20, 2023 statements that the project would "wrap up" by late October 2023; August-September 2023 pre-closing assurances that a ~$93 million Wolverine loan would fully fund completion with no additional pre-loan change orders and a September 2023 completion schedule; and a March 15, 2024 promise to finish within 150 days if credit increased.

176.     The information was false. The promised timelines and financing sufficiency were untrue and contradicted by events, including persistent understaffing, circulation of an inaccurate

41

September 2023 schedule, and the post-closing submission of more than $3.7 million in previously concealed pre-closing change orders despite assurances that none remained.

177.    Defendants failed to exercise reasonable care. The statements lacked a reasonable factual basis given known manpower shortages, deficient project controls, inaccurate cost-to-complete assertions, and internal admissions that leadership impeded needed site resources—rendering the schedule, cost, and "fully funded" representations negligently made.

178.    Chartwell justifiably relied on the information supplied by Defendants and suffered pecuniary loss in an amount to be proven at trial. Chartwell relied by deferring replacement of Killian, approving payments and change orders it otherwise would have contested, and entering and amending Wolverine / New Prime financing (including the September 29, 2023 loan and 2024-2025 amendments) in reliance on the above statements, resulting in increased completion costs, payments on invalid and/or inflated change orders, and substantial interest, fees, and carrying costs.

### COUNT VI:  ECONOMIC DURESS
### (AGAINST ALL DEFENDANTS)

179.    Chartwell incorporates all prior paragraphs by reference.

180.    Under Tennessee law, economic duress renders a contract voidable when one party uses wrongful or unlawful acts to take undue advantage of another's financial stress or extreme necessities, leaving the victim no reasonable alternative but to assent.

181.    Defendants engaged in wrongful conduct by deliberately delaying construction, submitting false and inflated change orders, and exhausting Chartwell's financing, thereby creating the financial distress that forced Chartwell to enter the Wolverine loan agreements. Defendants refused to perform their contractual obligations unless Chartwell agreed to modified terms, leaving Chartwell with no reasonable alternative but to accept.

42

182.     As a direct result of Defendants' wrongful conduct, Chartwell had no reasonable alternative but to enter into the Wolverine loan agreements. As Defendants designed, Killian's delays and overcharges had exhausted Chartwell's financing, and Chartwell's owners had already personally advanced more than $14 million to keep the project alive. Defendants exploited this vulnerability they caused, conditioning any financing on Chartwell's agreement to pay whatever Killian demanded. Damian Probstfield and Dean Hoedl informed Chartwell this was non-negotiable because Robert Low owns "both Killian and Wolverine," thus using Defendants' interlocking ownership to coerce Chartwell into accepting the loan agreements.

183.     As a result of this economic duress, Chartwell is entitled to rescission of the Wolverine loan agreements or, alternatively, damages including all interest, fees, and other amounts paid under the coerced agreements.

### COUNT VII:  UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

184.     Chartwell incorporates all prior paragraphs by reference.

185.     Chartwell conferred valuable benefits on each Defendant as follows:  (a) Wolverine was enriched by receiving more than $30 million in interest payments and more than $1.9 million in origination fees; (b) New Prime was enriched because, upon information and belief, it has received transfers of funds Wolverine collected from Chartwell, with knowledge of pre-closing undisclosed change orders and misrepresentations; (c) Robert Low was enriched because, as the controlling owner of Wolverine, New Prime, and Killian, he has received monetary distributions derived from Chartwell's payments of inflated invoices and above-market interest and fees; and (d) Hoedl, Probstfield, Smith, Bill Killian, and Lammey were each enriched through compensation, bonuses, distributions, and/or other benefits they received by virtue of their positions at Killian, Wolverine, and/or New Prime, which they would not have received but for the

43

ill-gotten gains from Chartwell resulting from Defendants' scheme.

186. Defendants appreciated these benefits: they demanded that Wolverine's financing would proceed only if Chartwell paid Killian's invoices and retained Killian; Low acknowledged the upside in The Manning's increased value while Wolverine took a first deed of trust; and Defendants negotiated and closed the $93 million loan and subsequent increases and amendments, collecting fees and interest throughout—demonstrating knowledge and acceptance of the benefits conferred by Chartwell's payments, continued performance, and collateral support.

187. No existing, enforceable contract between Chartwell and Defendants covers the subject matter of this claim. The contracts between Chartwell and Wolverine are not enforceable, and there are no contracts between Chartwell and any other Defendant.

188. It would be unjust for Defendants to retain these benefits. Defendants procured them through misrepresentations about completion timing, cost-to-complete, and financing sufficiency; by conditioning funding on paying disputed change orders and for work that was defective and/or not performed; by concealing pre-closing change orders; and by deliberately delaying the project while making new inducements to secure further payments. Equity and good conscience require restitution, disgorgement, and/or the imposition of a constructive trust.

### COUNT VIII: DECLARATORY JUDGMENT
### VIOLATION OF TENN. CODE ANN. § 47-14-117
### (AGAINST ALL DEFENDANTS)

189. Chartwell incorporates all prior paragraphs by reference.

190. In addition to the foregoing relief, Chartwell seeks a declaratory judgment because there is a substantial, immediate, and real controversy between parties with adverse legal interests regarding the enforceability and scope of Wolverine's loan documents and remedies: Wolverine has accelerated Chartwell's indebtedness, invoked a default interest rate, and claims ongoing

44

entitlement to interest and fees under the loan documents, while Chartwell contends those instruments are unenforceable in whole or in part under Tennessee usury law and that Wolverine may only recover principal actually advanced with lawful charges, if any.

191.     A present, concrete dispute exists over interest, fees, and collateral rights under the loan documents. The loan agreement carried a fixed 13% interest rate, which Wolverine increased to 16% by declaring a default. Wolverine has also charged more than $1.9 million in origination fees. The parties dispute whether these interest rates and loan charges are lawful, whether the loan documents (including the deed of trust) are enforceable, and whether Wolverine may collect the interest and fees against Chartwell (and must refund amounts already paid), and whether Wolverine could foreclose under the deed of trust on the collateral.

192.     The maximum interest rate in Tennessee applicable to lenders that are not banks or regulated financial institutions is the Tennessee formula rate. The Tennessee formula rate has not exceeded 12.5% during the life of this loan. Tennessee also does not permit origination fees unless such fees are tied to actual costs incurred by the lender. Here, Wolverine's origination fees greatly exceeded its actual costs incurred.

193.     Under Tenn. Code Ann. § 47-14-117(a), any contract that on its face requires usurious interest and/or excessive loan charges, commitment fees, or brokerage commissions "shall not be enforceable," and the lender is limited to recovery of principal actually advanced plus only lawful interest and lawful charges. The Wolverine loan documents state facially usurious rates and excessive loan charges—including a 13% non-default rate, a 16% default rate, and more than $1.9 million in origination fees untethered to actual lender costs—rendering the loan agreements and related documents unenforceable in their entirety; accordingly, the Court should declare the Wolverine loan documents void and of no effect, and further declare that Wolverine's remedies are

45

limited to recovery, if any, of principal actually advanced with only lawful charges.

194.     In the alternative, if the Court declines to declare the loan documents wholly void, Chartwell seeks a declaration that all usurious interest and unlawful loan charges are void and uncollectible, that Wolverine may not enforce any contractual provisions authorizing such amounts, and that Wolverine's recovery, if any, is limited to principal actually advanced plus only lawful interest and charges. At minimum, the Court should declare that default-rate interest at 16%, non-default interest to the extent above Tennessee's legal maximum, and the origination fees are unenforceable and must be excluded from any recovery and enforcement efforts under the loan documents, consistent with Tenn. Code Ann. § 47-14-117.

195.     Consistent with Tenn. Code Ann. § 47-14-117(c), Chartwell further seeks a declaration that Wolverine is not entitled to recover any usurious interest or unlawful loan charges with respect to the transaction; that Wolverine must refund any unlawful loan charges and twice the amount of any interest collected that exceeds statutory limits; that Chartwell is entitled to reasonable attorneys' fees; and that the Court will retain jurisdiction under 28 U.S.C. § 2202 to grant further necessary or proper relief, including an accounting and restitution, and to adjudicate whether Wolverine's collateral may be used to secure any statutory refund or penalty remedy.

### COUNT IX:  INJUNCTIVE RELIEF
### (AGAINST ALL DEFENDANTS)

196.     Chartwell incorporates all prior paragraphs by reference.

197.     In addition to all other forms of relief, Chartwell seeks preliminary injunctive relief preserving the status quo and enjoining foreclosure during the pendency of this action.

198.     Chartwell is likely to succeed on the merits of its claims, including one or more of the claims in Counts I-VII herein; Chartwell faces irreparable harm absent an injunction enjoining foreclosure for the reasons stated above; the balance of equities favors injunctive relief given the

unique, non-fungible nature of The Manning and the fact that foreclosure will render virtually unenforceable any judgment granted pursuant to the claims herein alleged; and the public interest is served by preventing a disruptive foreclosure while serious allegations of fraud and usury are adjudicated, including because a foreclosure would adversely affect both current and prospective owners of condominium units in The Manning.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Chartwell respectfully requests that the Court empanel a jury to try this action and enter judgment in its favor and against Defendants, jointly and severally as permitted by law, and award the following relief:

1.     Compensatory damages in an amount to be determined at trial, including all interest and fees paid to Wolverine, all amounts paid to Killian for work that was defective or never performed, and Chartwell's increased carrying costs proximately caused by Defendants' conduct.

2.     Treble damages for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c), on Chartwell's § 1962(c) claim.

3.     Punitive damages on Chartwell's Tennessee fraud and civil conspiracy claims, in an amount sufficient to punish and deter.

4.     Rescission of the Wolverine loan documents as a result of Defendants' fraudulent inducement and economic duress, including without limitation a declaration that Wolverine's deed of trust on the property is void and that Wolverine has no right to foreclose.

5.     An order piercing the corporate veil and (i) holding Low personally liable for the unlawful conduct of Wolverine, New Prime, and non-party Killian and (ii) imposing joint liability among Wolverine and New Prime for their unlawful conduct and that of non-party Killian.

6.     A declaratory judgment that the Wolverine loan documents are unenforceable in whole or in part under Tenn. Code Ann. § 47-14-117, that all usurious interest and unlawful charges

47

(including interest at rates of 13% and/or 16% and origination fees) are void and uncollectible, and that Wolverine's recovery, if any, is limited to principal actually advanced plus only lawful charges; and ordering such refunds, credits, and additional relief, including twice the amount of any interest collected above the statutory maximum and Chartwell's reasonable attorneys' fees.

7.     Disgorgement, restitution, and/or imposition of a constructive trust over benefits unjustly obtained by Defendants, including but not limited to interest, fees, and sums collected for work that was defective or never performed.

8.     Rescission, reformation, and/or declaratory relief invalidating any purported releases or waivers that were procured by fraud or economic duress, and/or are beyond their lawful scope, together with restoration of rights and remedies consistent with such relief.

9.     Pre- and post-judgment interest to the fullest extent permitted by law.

10.     Reasonable attorneys' fees, costs, and expenses, including without limitation under 18 U.S.C. § 1964(c) and Tenn. Code Ann. § 47-14-117.

11.     Entry of a temporary restraining order, preliminary injunction, and/or permanent injunction barring Wolverine from foreclosing on the property or otherwise taking any action that would diminish the value of the property.

12.     Such other and further relief as the Court deems just and proper.

Dated: February 24, 2026
Nashville, Tennessee

Respectfully submitted,

*/s/ Ryan T. Holt*
Ryan T. Holt (#30191)
Rascoe Dean (#34209)
Brettson J. Bauer (#39289)
SHERRARD ROE VOIGT & HARBISON, PLC
1600 West End Avenue, Suite 1750
Nashville, TN 37203
Phone: (615) 742-4200
rholt@srvhlaw.com
rdean@srvhlaw.com
bbauer@srvhlaw.com

*and*

*/s/ Aubrey B. Harwell Jr.*
Aubrey B. Harwell Jr. (TN BPR #2559)
1600 West End Ave., Suite 1400
ADAMS & REESE, L.L.P.
Nashville, TN 37203
aubrey.harwell@arlaw.com

*Counsel for Plaintiff Chartwell Properties, LLC*

49

**APPENDIX 1: ORGANIZATIONAL CHART**

